**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

GENE SANCHEZ,

       Plaintiff,

v.                                            No. CIV 06-355 LFG/RLP

CENTURY BANK, FEDERAL SAVINGS BANK,
a New Mexico Corporation,

       Defendant.

**MEMORANDUM OPINION AND ORDER
<u>DENYING MOTION FOR SUMMARY JUDGMENT</u>**

**<u>Introduction</u>**

THIS MATTER is before the Court on Defendant Century Bank's ("Century Bank" or "Century") Motion for Summary Judgment, filed January 16, 2007. [Doc. Nos. 15, 16.] On April 3, 2007, Plaintiff Gene Sanchez ("Sanchez") filed a response in opposition. [Doc. Nos. 29, 30.] On April 13, 2007, Century Bank filed a reply and on April 17, 2007, a corrected exhibit to the reply. [Doc. Nos. 37, 39.] The motion is fully briefed and may be resolved on the pleadings without oral argument. After careful consideration of the pertinent law, pleadings and exhibits, the Court concludes that a genuine issue of material fact remains for resolution by a jury. Thus, Century Bank's motion for summary judgment will be denied.

## Background

Sanchez's Civil Rights Complaint alleges that Century Bank unlawfully discriminated against him based on his national origin (Hispanic) in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* Sanchez requests damages for a lost back pay and future differential in pay as well as emotional distress. He also seeks punitive damages for alleged intentional discrimination. Century Bank denies that it discriminated against Sanchez and asserts that it had legitimate, non-discriminatory reasons for terminating Sanchez. Sanchez claims the Century Bank's proffered reasons for its termination decision were a pretext for unlawful discrimination.

## Material Facts

The following material facts are taken from the parties' pleadings and attachments. Most are undisputed. To the extent that disputes exist, the Court has noted them.

1.      On June 3, 2002, Century Bank hired Sanchez to be a Vice President and Branch Manager of a new Century Bank branch to be opened in Española, New Mexico. Century Bank's primary location of business is in Santa Fe, New Mexico, where there are several branches, and it has a branch bank in Española, New Mexico. Española is small community in Rio Arriba County, with a population of about 10,000 people, the majority of whom are Hispanic.[1]

2.      Sanchez is Hispanic. Prior to being hired by Century Bank in Española, Sanchez had over 18 years of banking experience with Bank of America.

---

[1]The 2000 census reports that 84.38% of the City's residents were Hispanic (Demographics, 2000 U.S. Census Data, http://muninetguide.com/states/New_Mexico/municipality/Espanola). A court may take judicial notice of facts that are not subject to reasonable dispute when the fact is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b and c).

3.      Phil Essig, an Anglo, is the Executive Vice President of Retail Banking for Century Bank, who interviewed Sanchez and recommended that Sanchez be hired.  Essig did "all the hiring" in conjunction with Century Bank's CEO Bryan "Chip" Chippeaux.  Chippeaux made the final hiring decision.  [Doc. 16, Essig Aff., Doc. 16, p. 2.]  Essig was Sanchez's direct supervisor and evaluated Sanchez's work performance.  [Doc. 16 (Affidavit of Phil Essig).]

4.      Sanchez was responsible for staffing and operating the new Española Century Bank branch.  [Doc. 16, Essig Aff.]  Initially, the Española branch was housed in a doublewide manufactured housing building, pending the permanent construction of leased space in Española.  Sanchez was primarily responsible for overseeing the transition from the older space to the newly constructed bank.

5.      Essig prepared Sanchez's first written annual performance review, dated March 7, 2003.  [Doc. 16, Ex. A.] The review is a one page-memorandum that primarily praises Sanchez's first nine months of performance.  "You did an excellent job getting the branch (physical plant) ready and a splendid job hiring the staff.  The branch was up and operating on schedule . . . often a very difficult task, especially in New Mexico."  In the annual review, Essig asked Sanchez to prepare and finalize a business plan by the end of January (2004).  Essig also stated that Sanchez's "ability to communicate is among the best.  Please make sure, however, that you maintain confidentiality when necessary."

6.      On April 16, 2003, the Española Century Bank branch held its grand opening in its new location.  The public was invited.  [Doc. 16, Essig Aff.]  Sanchez was responsible, in large part, for planning the event.  [Doc. 30, Sanchez Dep.]  There was a tremendous turnout for the grand opening, during which the Branch ran out of catered food.  Earlier that same day, Sanchez spoke to

3

Mike Warren, Century Bank's President, and Sanchez told Warren that the caterer was going to bring about 10 percent more food than what they estimated was necessary.  Sanchez told Warren that he would "like to do the 10 percent if we run out of food."  Warren responded: "I wouldn't do it."  Sanchez stated that "I think I will."  The extra food was needed and provided, but the Branch overspent its targeted budget for the event by several thousand dollars.  Essig later asked Sanchez about the overspending and Sanchez told Essig that he had spoken to "Mike" [Warren].  According to Sanchez, Essig said "You did not.  You liar."  [Sanchez Dep. at 40.]  Sanchez provided no additional explanation to Essig about his earlier conversation with Warren.  Sanchez contends that Essig cut him off in mid explanation.  Essig believed that Sanchez made a false statement to him regarding having authority to order additional food from the caterers.  Essig was more upset about the alleged falsehood that Warren approved the change rather than the actual decision to provide more food.  Indeed, Essig agreed that more food was necessary but believed Sanchez's response was deceptive.  No testimony was provided by Warren to substantiate either Essig's or Sanchez's assertion.

       7.     In 2004, Sanchez met some, but not all, of the goals for his branch.  Essig testified that Sanchez never had any staff turnover.  Sanchez's branch bank had the lowest staff turnover of any of Century's branch banks.  The operations of the branch worked pretty well and Sanchez's goals relating to fees were met.  The problems were with insufficient loans and deposits.  [Doc. 30, Essig Dep.]  However, Essig did not discipline Sanchez for failure to meet any of his goals.  [Id.]  Sanchez testified that the Española branch was outperforming other Century Bank branches in several categories, although not in all categories.  [Doc. 30, Sanchez Dep.]

8.     At a branch manager meeting, one branch manager, Mary Chavez, testified that Essig was talking about the dress code and a dress code violation by a particular Hispanic female manager and that Essig said the female Hispanic manager either dressed "like a slut" or dressed "slutty" [Doc. 30, Chavez Dep.], and wanted training on proper business attire to demonstrate proper and improper work attire.   On February 11, 2004, Century Bank decided to have a "fashion show/dress code training event."   Century Bank, through its Human Resources Director and a Training Officer, telephoned Sanchez and said they wanted him to participate in the fashion show.   Sanchez responded that he was not comfortable doing it.   The Human Resources Director stated that it was "all in fun," Chippeaux, the Bank's CEO, was participating, and it would look bad if Sanchez, the highest ranking bank officer in Española, did not participate.   [Doc. 30, Sanchez Dep.]   Sanchez believed he needed to do it since the CEO was participating.   The Human Resources Director told Sanchez to "do something about Española on how not to dress" and that the bank would pick the music for him.   The bank training officer told Sanchez that "you're [the community of Española] known for your low riders."   The Human Resources Director told him that he could dress "like a cholo or a low rider."[2] Sanchez was asked to dress like the stereotypical "cholo gangster" and he performed as requested at the "fashion show" by dancing to a song about "low and slow" lowrider automobiles.   Sanchez believed, however, that being required to dress or pose as a "cholo" to the music "Low Rider" was humiliating, degrading, and offensive to the Hispanic community.

---

[2]The term is considered somewhat pejorative and refers to a "Mexican gangster" or "Mexcian gangster style."  Urban Dictionary, http://urbandictionary.com/define.php?term=cholo.  "A cholo is a term implying a Hispanic male that typically dresses in chinos (Khaki pants), a wifebeater sleeveless teeshirt or a flannel shirt with only the top buttoned, a hairnet, or with a bandana around the forehead, usually halfway down over the eyes. Cholos often have black ink tatoos, commonly involving Catholic imagery, or calligraphy messages or family names."  Id.  The term is a stereotypical depiction of Hispanic hoodlums.

9.      Around November 2004, Essig heard that Valley National Bank ("Valley"), a banking business competitor in Española, had increased their banking deposits by an additional $20 million the preceding year.  Essig asked Sanchez to see if he could find out what Valley had done to increase its business.  Sanchez telephoned Valley National Bank and spoke to its branch manager, Linda Garcia, who served under Bob Gossard, Valley's Executive Vice President.  Sanchez was not previously acquainted with Linda Garcia, but sought to engage her in conversation to learn what he could about Valley's strategy.  Accounts of the telephone conversation are disputed.  According to Essig, Sanchez insinuated that Century's President, Mike Warren, was not happy at Century and did not have any power.  Sanchez also supposedly complained that he was upset about having to work on a holiday.  [Doc. 30, Essig Aff.]  Sanchez testified that he spoke to Linda Garcia about Valley's "numbers" and "deposit growth" and that she asked how Sanchez liked working for Mike Warren, who previously worked at Valley.  Linda Garcia and Sanchez spoke about the different structures of the two banks, and Sanchez noted that under Century's structure, Warren did not have as much power as Linda Garcia said Warren had had while working at Valley.  [Doc. 16, Sanchez Dep.]  Essig was told about the conversation by Gossard and Essig then confronted Sanchez about having spoken about Warren to Valley.  Sanchez initially denied talking to anyone about Warren at Valley because he did not feel he improperly disclosed information about Century to personnel at Valley.  Sanchez felt most of the comments about Warren were initiated by Linda Garcia.  Essig believed the second-hand report conveyed to him by Gossard and thought Sanchez "talked too much."  [Doc. 16, Essig Dep.]

10.     At some point during his employment at Century, Sanchez had a conversation with Essig about "mail-outs for the totally free checking" to be sent to people in the northern New Mexico

communities of Truchas or Cordova.   These isolated rural communities are very small with predominantly Hispanic populations.  According to Sanchez, Essig stated that he did not really want to send any up to those areas because Essig had had a bad experience with "those people."  [Doc. 30, Sanchez Dep.]  Essig did not explain or elaborate on what he meant by "those people" nor did he deny that he said that.

11.     Amy Stout, Essig's secretary/assistant, testified that she overheard Essig make a racist comment using the racial epithet "nigger," unrelated to and after Sanchez's termination.  [Doc. Nos. 30, 37, Stout Dep.]  Ms. Stout testified further that a bank marketing employee said to Ms. Stout, "Well, you do know that deep down inside Phil [Essig] is a little bit racist, don't you?"  Ms. Stout concurred.  [Id.]  Ms. Stout prepared a proposal for Essig's review that would have expanded the bank's marketing to Mexican Nationals.  The proposal would facilitate bank fund transfers from Mexican workers in the United States to their families in the Republic of Mexico.  Other banks that made fund transfer services available to Mexican Nationals increased their business and deposits. Essig, however, was not interested in the proposal and allegedly told Ms. Stout he did not want his banks to be anything but "English-speaking" banks.  [Id.]

12.     On November 8, 2004, Essig wrote a memo to the Executive Committee of the bank stating that, after 30 months, the Española bank had reached its goals in smooth operations despite the branch's remote location, had exceeded expectations of new fee income and had provided excellent service with "0" staff turnover.  However, the memo also states the Española branch did not come close to meeting its deposit goals, was not as successful as hoped in the lending area, and did not made significant inroads in the Española business area.  Essig wrote that the bank did not have "any of the management in place show they could become a pillar in the community."  [Essig Aff.,

Ex. C.]  Essig suggested that the Committee consider making the Española branch similar to a "de novo" bank.  He stated the "present management" did not have the "status or management expertise (nor in Gene's case, drive) to fill the role we need to make our mark in Española."  Essig suggested hiring a high level banking executive in Española who has the status to mix with business and community lenders as the "President of Century Bank Española."  He recommended filling this new slot with Bob Gossard who was working as Executive Vice President at Century Bank's business competitor in Española, the Valley Bank.  Essig did not state in this memo that he recommended or intended to terminate Sanchez.  [Id.]

13.    However, in his Affidavit, Essig stated that after he learned of Sanchez's conversation with Linda Garcia, Essig realized that "Sanchez would probably not work out at Century Bank.  He had failed to meet some of the performance goals for the branch for the two years that he had managed it, he had failed to timely complete and submit a business marking [sic] plan for his branch, he showed an inability to maintain management confidences, and he had made a false statement to me regarding approval of catering overage for the grand opening."  [Doc. 16, Essig Aff.]

14.    Essig then testified that when he discussed his concerns with Sanchez regarding the conversation with Linda Garcia and confidentiality issues, Sanchez asked Essig if Sanchez was going to be fired.  Contrary to Essig's statement in ¶ 12 of his affidavit, Essig testified that he reassured Sanchez that he had not reached any decision about that yet (i.e., Sanchez's termination) and would not do so until after the holidays.  [Doc. 16, Essig Aff., ¶ 13.]  This is contrary to Defendant's proposed undisputed fact no. 8, wherein Defendant avers that by late November 2004, after Essig learned of Sanchez's "breach of confidence to Linda Garcia and in light of Sanchez's less than stellar

performance over . . . two years of employment, Essig decided to terminate Sanchez with severance
[pay] . . . ." [Doc. 16, p. 6, ¶ 8.]

15.     Essig prepared a 13-page Performance Review for Sanchez for the year 2004.  Essig
signed and dated the form, December 30, 2004.  [Doc. 16, Essig Aff, Ex. B.]  Essig gave
performance ratings of "fully satisfactory" and "below satisfactory" for Sanchez's Branch Goal
Report, a rating of "greatly exceeded" expectations for "staffing," and a rating of "below satisfactory"
for "marketing plan."  [Doc. 16, Ex. B to Essig Aff.]  With respect to "achievement and results
orientation," and "planning and organization," Sanchez was rated as having "met essential
expectations and requirements for the position."  Essig commented that Sanchez did "an excellent
job of moving into the new facility, managing staff, coordinating all outside groups and ensuring all
operating entities were functioning properly."  Essig also wrote:

> Because of personal factors, Gene's overall performance, enthusiasm
> and accomplishments were average and below his efforts from the
> prior year.  Toward the end of the year Gene finalized a marketing
> plan (which should have been completed in April) and is now
> implementing it.  His success here will be a key to reaching 2005
> goals.

Sanchez testified that Essig gave him an extension of time to finalize the marketing plan because
Sanchez was opening a new branch, and that Essig told him "you have a full plate.  Get it to me when
you can." [Doc. 16, Sanchez Dep.]

16.     On the 2004 performance review, Essig further commented that Sanchez ran the
branch in "a very competent manner – excellent in both operations and basic work flow."  Essig felt
Sanchez would have received an "exceeds expectations" rating in this area but he did not find that

Sanchez "pushed for excellence in 2004" and instead found Sanchez needed to be more "pro-active" in attaining goals.

17.     Essig also stated in the 2004 review that Sanchez "continued to shine in" the category of teamwork and people skills. Sanchez maintained a "0" turnover throughout 2004. In other words, Sanchez maintained the same staff for 30 months. This retention rate is most unusual and serves to increase productivity while at the same time reduces recruitment and training costs. Essig's review stated: "the respect his staff has for him is exemplary."

18.     In the 2004 review, Sanchez was rated as not providing the "leadership necessary in setting a direction for Española to accomplish its major goals . . . deposits and inroads in the business community." "Gene was not able to concentrate on his personal banking development during the year. This will be critical for him in 2005. He needs to see a bigger picture in order for him to develop strategically."

19.     Essig concluded that Sanchez did an excellent job of working with existing customers and had received many compliments regarding both his and his staff's efforts in 2004. However, "an outside sales calling culture was not developed in 2004," which was a "must" in 2005.

20.     At the end of the 2004 review, Essig provided more extensive commentary on Sanchez's performance. Essig first noted that Sanchez's work performance was negatively affected by personal events (which apparently included a death in his family). Essig highlighted "two major lapses in judgment" that seriously affected Essig's ability to "continue to place trust" in Sanchez. Those lapses were the alleged dishonesty regarding approval from Warren to run overbudget on the grand opening of the branch, and Sanchez's conversation with Linda Garcia at Valley National Bank

where he allegedly disclosed confidential bank information.  The 2004 review ends by stating "action to be taken is being reviewed."

21.    On January 7, 2005, Essig met with Sanchez in Española.  According to Defendant, Essig advised Sanchez he would be terminated but given three months' severance, and at his option, could continue to work at the branch and apply for alternative employment for a certain period of time.  Defendant does not state that Essig informed Sanchez on January 7, 2005 that he was being terminated for work performance issues.  [Doc. 16, p. 3.]  In Essig's affidavit, he stated that his reasons for terminating Sanchez stemmed from inadequate work performance in major areas and repeated breaches of management confidences, etc.  [Doc. 16, Essig Aff.]  Yet, Essig's affidavit did not state that he informed Sanchez on January 7, 2005 that work performance issues were the reason for his termination.  [Doc. 16, Essig Aff, ¶¶ 14, 15.]  Essig noted that he gave Sanchez the 2004 performance review during the January 7, 2005 meeting, although the review form itself contains a written notation that Sanchez refused to sign it on 1/26/05.  [Doc. 16, Essig Aff., Ex. B, p. 13.]

22.  In a letter to Sanchez, dated January 14, 2005, Essig thanked Sanchez for meeting with him and "discussing your employment with Century Bank."

> As I explained, Century Bank has decided to restructure management of the Española branch to step it up to the stature and presence of a full, *de novo* bank in Española.  Along those lines, we have recruited a new president to lead and implement that greater banking presence in Española.  We expect that the new president will select his own management team; however, there will be a period of transition as he begins work this year.

Essig then set forth the offers extended to Sanchez during the January 7 meeting, including the offer to allow Sanchez to work through March 7, 2005 and then resign and receive three months' salary as  severance pay or to resign his employment effective January 31, 2005 with two months severance

pay.  [Doc. 16, Essig Aff., Ex. D.]  Nothing in the letter indicated Sanchez was being terminated for poor performance.

23.     Before the end of January 2005, Sanchez informed Essig that he had found another job at the Community Bank in Española.  [Doc. 16, Essig Aff.]

24.     After Essig wrote his November 2004 memo to the Executive Committee, he was given the "go-ahead" to explore recruiting Gossard from Valley National Bank.  Essig stated that when he contacted Gossard, Gossard asked to see Century's confidential audited financials and balance sheets for Century's Española branch.  Essig averred that this type of request was typical due diligence on the part of a candidate for a high level executive position with a bank.  He had his secretary/assistant Amy Stout copy and overnight the requested items to Gossard.  Essig explained that the information contained in these documents was the same information the bank is required to provide to federal regulators as part of its regular reporting.  [Doc. 16, Essig Aff.]

25.     Ms. Stout testified that she sent Century Española branch's trend analyses,  "goals spreadsheets," and deposit information to Gossard, all of which she considered to be confidential documents.  She testified further that while much of this type of information eventually becomes a matter of public record, the details do not.  For example, the "total dollar amounts" rather than the account-specific breakdown becomes public information or information reported to the FDIC.  A certain layer of detail, e.g., type of account, is not reported to the FDIC.  [Doc. 30, Stout Dep.]

26.     Bob Gossard, an Anglo, was hired as the President of Century Bank's Española branch.  Eileen Tyrell, Century's Human Resources Director, initially testified in her deposition that Gossard was the individual who replaced Sanchez.  [Doc. 16, Tyrell Dep.]  Later in the deposition, she testified that Gossard did not "replace" Sanchez; instead, Gossard filled a new position, identified

12

as President of the branch.  Several months after his hiring, Gossard brought in Linda Garcia, his former assistant (Hispanic), from Valley as the Branch Manager of Century Bank's Española branch. [Doc. 16, Essig Dep.]

27.     During Sanchez's employment with Century Bank, there were four other Branch Managers – three were Hispanic, and one, Jeff Szabat, was not.  At some point, Essig retired and Szabat was given Essig's position.  When Essig first hired Szabat, he told Szabat that "if everything went well and he did a good job, he [Szabat] would take my [Essig's] position because he had the experience." [Doc. 30, Essig Dep.]  Essig stated he was intending to retire and was trying to fill his own position.  Essig did not make the same kind of statement to any of the Hispanic branch managers.  Sanchez testified that neither he nor any of the other Hispanic branch managers applied for Essig's position because the job position was not advertised, nor had it become vacant; instead, it was just given to Szabat.  Sanchez testified further that two of the Hispanic branch managers were interested in the position but could not apply since Szabat already was appointed to the position. [Sanchez Dep.]

## Summary Judgment Standard

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary

evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment.  Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), *cert. denied*, 537 U.S. 816 (2002).  Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).

The Tenth Circuit further explained, however, that the nonmovant's burden to respond arises only where the summary judgment motion is properly "supported."  Reed v. Bennett, 312 F.3d 1190, 1194 (10th Cir. 2002).

> Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c).  If the evidence produced in support of the summary judgment motion does not meet this burden, 'summary judgment must be denied, *even if no opposing evidentiary matter is presented.*'

Id. (emphasis in original) (internal citation omitted).

## Analysis

## I.   NATIONAL ORIGIN DISCRIMINATION

Title VII prohibits an employer from terminating any individual because of race or national origin.  42 U.S.C. § 2000e-2(a)(1).  Without direct evidence of discrimination, the Court applies the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this scheme, the plaintiff first must establish a *prima facie* case of discrimination.  The burden imposed

on a plaintiff at the *prima facie* stage is "not onerous." Ortiz v. Norton, 254 F.3d 889, 895 (10th Cir. 2001) (internal citation omitted).

A plaintiff alleging discrimination on the basis of national origin or race must typically show: (1) he belongs to a protected class; (2) was qualified for his job; (3) was terminated despite his qualifications; and (4) the job was not thereafter eliminated. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006) (internal citation omitted). The Court disagrees with Defendant's statement of the law, i.e., that the plaintiff must make a *prima facie* showing that similarly situated non-minority employees were treated differently. [Doc. 16, p. 12.] The Tenth Circuit acknowledges that a plaintiff alleging discrimination in violation of Title VII can satisfy the last or fourth element of his *prima facie* case in a number of ways, including by showing that the position from which he was discharged was not eliminated or that it was filled by someone else. Ortiz, 254 F.3d at 895; Amro v. Boeing Co., 232 F. 3d 790, 796 (10th Cir. 2000). The plaintiff need not show that the position was filled by someone outside his protected class. Amro, 232 F.3d at 796.

Once the plaintiff satisfies the initial burden, under McDonnell Douglas, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the adverse employment action. Antonio, 458 F.3d at 1181 (internal citations omitted). If the defendant meets its burden, the burden returns to the plaintiff to show that the defendant's proffered reason is a pretext for prohibited discrimination. Id.

A plaintiff demonstrates pretext by showing either that discriminatory intent more likely motivated the defendant with respect to its proffered explanation for the adverse action or that the employer's proffered explanation is unworthy of credence. Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003). Generally, "isolated racial comments" are insufficient to show pretext unless

they are linked to the employment action at hand.  Equal Employment Opportunity Commission v.

BCI Coca-Cola Bottling Company of Los Angeles, 450 F.3d 476, 489 (10th Cir. 2006) (internal

citation omitted), *cert. dismissed*, __ U.S. __, 2007 WL 1086301 (Apr. 12, 2007).

> Nonetheless, at the summary judgment stage "all rational inferences
> from the evidence must be made in favor of the party opposing the
> summary judgment motion."  Ortiz v. Norton, 254 F.3d 889, 896
> (10th Cir. 2001).  In Ortiz, we held that evidence of discrimination in
> employment decisions affecting other workers "could support an
> inference that the decision makers harbored a bias against Hispanics
> which might have affected other decisions, including the decisions
> adverse to plaintiff."  A plaintiff "may also show pretext" by providing
> evidence that he was treated differently from other similarly situated,
> nonprotected employees who violated work rules of comparable
> seriousness," "provided the "similarly situated" employee shares the
> same supervisor, is subject to the same performance standards, and
> otherwise faces comparable "relevant employment circumstances."

Id. (internal citations omitted).

   Pretext is also demonstrated by evidence of "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer

that the employer did not act for the asserted non-discriminatory reasons."  Id. at 490 (internal

citation omitted).  The Tenth Circuit has said "[e]vidence of pretext may include prior treatment of

[the employee]; the employer's policy and practice regarding minority employment . . .; disturbing

procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective

criteria."  Jaramillo v. Colo. Jud. Dep't., 427 F.3d 1303, 1308 (10th Cir. 2005) (*en banc*) (*per
curiam*).

## II.      DISCUSSION

### A.      Prima facie case of national origin discrimination

Defendant does not dispute that Sanchez was a member of a protected class or that he suffered an adverse employment decision.  There is no discussion by Defendant as to whether Sanchez was qualified for his position since Defendant did not include this element as part of Plaintiff's *prima facie* case.[3]  Sanchez's burden is not onerous at this stage.  *See* Ortiz, 254 F.3d at 894-95.  Due to Sanchez's 18 years of banking experience before being hired by Century and his positive, if not positively raving evaluations at times, the Court concludes Sanchez met his burden in showing he was qualified for the position and that he was terminated despite his qualifications.  There is no dispute that the fourth element is also met, i.e., the position remained open and was filled after Sanchez was terminated.  Thus, Sanchez satisfied his burden with respect to a *prima facie* case of national origin discrimination, and the burden shifts to Century Bank.

### B.      Century Bank's Proffered Non-Discriminatory Reason for Sanchez's Termination

Century Bank introduced evidence of a non-discriminatory reason for its decision to terminate Sanchez.  Essig testified that he decided to terminate Sanchez because of his "unsatisfactory work performance in major areas, his repeated breaches of management confidences, his making a false statement directly to me and his overall inability to lead the Española branch by developing business in the Española Valley region."  These are all non-discriminatory business reasons for termination.  Thus, Century Bank satisfied its burden under the McDonnell-Douglas burden-shifting framework.

---

[3]Even if Century Bank were to argue Sanchez was not qualified for the position, it would be contradicted by Sanchez's long history of banking experience and his performance review, in which Essig wrote: "Gene, you bring a wealth of experience to Century, both in banking knowledge and understanding the Española market." [Doc. 16, Essig Aff. Ex. A.]

The burden then returns to Sanchez to show, if he can, that there is a genuine issue of material fact with respect to whether Century Bank's proffered reasons for the adverse action were a pretext for discrimination.

    C.    <u>Pretext</u>

      The Court concludes there is sufficient evidence to create a genuine issue of material fact for a jury to decide whether Defendant's proffered reason for Sanchez's termination was a pretext for unlawful national origin discrimination.  It is true that in his response brief, Sanchez did not expressly challenge some of Century Bank's proposed undisputed material facts, e.g., nos. 8 and 9, which state that Sanchez was terminated for "less than stellar [work] performance", "breaches of confidence" and stating "a falsehood" to Essig.  Notwithstanding this failure, the Court still must determine whether Century, the moving party, met its initial burden of production under Rule 56(c). In other words, if Century's evidence does not meet this burden, "summary judgment must be denied, *even if no opposing evidentiary matter is presented.*"   <u>Reed</u>, 312 F.3d at 1194 (emphasis in original).  In viewing both the evidence presented by Century and Sanchez, including Essig's affidavit and attachments and the deposition testimony, the Court concludes a genuine issue of material fact exists regarding the question of pretext.

      First, the Court observes that Century Bank offers an inconsistent explanation for Sanchez's termination.  In the letter from Essig to Sanchez, dated January 14, 2005, Essig implies that the reason for terminating Sanchez's employment is because the bank "decided to restructure management of the Española branch to step it up to the stature and presence of a full, *de novo* bank in Española." [Doc. 16, Essig Aff., Ex. D.]  Essig explained that "along those lines, the bank had recruited a "new president" to lead and implement that greater banking presence in Española" and

that Century expected the new president would select his own management team.  [Id.]  Nothing in the letter indicates that Essig was dissatisfied with Sanchez's work performance or that work performance issues with Sanchez precipitated the decision to end Sanchez's job with Century.  To the contrary, the letter simply implies that Century Bank wants to move in a new managerial direction.

Similarly, in Essig's affidavit, he refers to the January 7, 2005 meeting with Sanchez wherein Essig states he advised Sanchez that Sanchez would be terminated with severance pay.  [Doc. 16, Essig Aff., ¶ 14.]  Indeed, the offer of a severance package is inconsistent with a cause-based termination for poor performance.  Although Essig states he gave Sanchez his 2004 performance review "which sets forth in Section 3 - Overall Performance all of my concerns about his performance," the performance review did not state Sanchez was to be disciplined or terminated.  Essig explains that he gave Sanchez two alternative offers for severance during the January 7, 2005 meeting, yet nothing in that portion of Essig's affidavit (that refers to the January 7, 2005 meeting) indicates Essig expressly informed Sanchez he was being terminated for unsatisfactory work performance.  It is not clear whether Essig's reference to the 2004 performance review meant that Essig gave Sanchez a copy of the review that day or if he read from the review.  In any event, the affidavit does not state that Essig told Sanchez on January 7, he was being terminated for performance issues.

Moreover, Essig testified in his affidavit that he realized Sanchez "would probably not work out at Century Bank" after learning (apparently in November 2004) about Sanchez's conversation with Linda Garcia at Valley, a conversation that had been prompted by Essig's request to Sanchez to find out information about Valley's marketing strategy.  But, when asked point blank by Sanchez

19

if Sanchez was going to be terminated, Essig told him he had "not reached a any decision about that yet and would not do so until after the Christmas holidays."  [Doc. 16, Essig Aff. ¶¶ 12, 13.]

Essig's November 8, 2004 memo to the executive committee of the bank proposed hiring a high level banking executive who had the status to mix with business and community leaders and developing a new position for the Española bank, that of "President."  While the memo noted Essig's dissatisfaction with Sanchez's "drive," nothing in the memo specifically stated that Essig found Sanchez's work performance inadequate.  Again, the memo does not create the impression that Essig believed Sanchez was slated for termination because of breaches of confidence, trustworthiness issues, failure to meet performance goals and failure to submit a timely business marketing plan.  To the contrary, these explanations appear to be offered as after-the-fact rationalizations.

Essig's affidavit testimony and the January 14, 2005 letter to Sanchez give the impression that Essig wanted to change the nature of the structure of Española's bank management, create a new higher level position, and bring in someone who Century believed had more ties and clout in the community.  If this was the bank's reason for terminating Sanchez, there was nothing unlawful about that reason.  Courts do not sit as a super board of directors second guessing business decisions or determining whether such decisions are prudent, sound or ill-advised.  Simms v. Okla. *ex rel.* Dep't of Mental & Substance Abuse Serv., 165 F.3d 1321, 1330 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999).

However, Century Bank did not leave the explanation at that.  Rather, the bank seems to "build a case" about Sanchez's inadequate work performance and breaches of trust to justify the change of management.  The result is "weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions" that a reasonable factfinder might rationally find unworthy of credence and therefore, pretextual.

Essig's statement that Sanchez's "repeated breaches of management confidences" justified termination appears overblown, implausible, and inconsistent with performance reviews. Essig only discussed three examples of possible breaches, rather than "repeated breaches." The first was an unexplained and unclear written comment in Sanchez's first performance review that leaves a vague impression that Sanchez might not have kept something confidential. The second, concerning bank president Warren's authorization or lack thereof for Sanchez to over spend the food budget at the grand opening of the branch, was neither confirmed nor contradicted by Warren. For example, there is no deposition or affidavit testimony from Warren stating that he did or did not discuss with Sanchez the possible need for more food for the event. There was no disciplinary action taken against Sanchez for this alleged dishonesty. For the most part, the bank was exceedingly complimentary about Sanchez's management of the opening of the Española branch. Essig's March 7, 2003 review states "you did an excellent job getting the branch (physical plant) ready and a splendid job hiring the staff. the branch was up and operating on schedule...often a very difficult ask, especially in New Mexico." [Doc. 16, Ex. A.]

The third "breach of confidentiality" concerns the telephone conversation between Sanchez and Linda Garcia that Essig prompted Sanchez to make so that Century Bank could learn how Valley, its competitor in Española, had accomplished an additional $20 million in deposits the preceding year. During this conversation, if Century is to be believed, Sanchez talked to the competitor about Century's CEO being unhappy and Sanchez's own displeasure at having to work on a holiday. It seems unlikely, if not unbelievable, that it is reasonable for Sanchez to be requested to inquire into

Valley's internal marketing or business strategies, while it is sanctionable for Sanchez to say that Warren was not entirely happy or Sanchez was not happy about working a holiday.  Again, Sanchez was not written up for this "breach," and again, this type of proffered reason for terminating Sanchez appears fabricated.

Essig's view that Sanchez's statements, if true, exhibited "disloyalty" by Sanchez seems particularly implausible when Essig, an Anglo, had his assistant send detailed confidential banking information of Century's to its competitor, Valley National Bank, in order to try to recruit Gossard to Century.  Essig's explanation may be true that such disclosures are typical responses to "due diligence" requests by a candidate for a high level executive banking position.  However, Sanchez's alleged disclosures, i.e., that the Century CEO did not have as much authority at Century as he had at Valley or might not be entirely happy, or that Sanchez was unhappy about working on a holiday, are tame in comparison.  Gossard was hired and thus, the disclosure of Century Bank's confidential information, balance sheets and plans proved to be harmless.  But, what if Gossard had declined the job offer?  Would he have been able to forget and not capitalize on Century's confidential information?

Essig's testimony that part of the reason Sanchez "would probably not work out" at Century was due to Sanchez's failure to timely complete and submit a business marketing plan for his branch is contradicted by Sanchez's testimony that Essig gave Sanchez an extension due to the opening of the new branch and Sanchez's testimony that Essig told him:  "You have a full plate.  Get it to me when you can."  If a jury opts to believe that explanation, then Sanchez's tender of the marketing plan was not untimely.

Furthermore, Essig's testimony that he terminated Sanchez because of Sanchez's failure "to meet some of the performance goals for the branch for the two years he had managed it," "unsatisfactory work performance in major areas," and "his overall inability to lead the Española branch by developing business in the Española Valley region" is highly questionable when compared to Sanchez's performance reviews.

The reviews were discussed extensively *supra*, and the Court does not repeat all of those commentaries here.  *See* Fact Nos. 5, 7, 12, 15-20.  However, after nine months on the job, Essig praised Sanchez: "you did an excellent job," a "splendid job", "we sure are pleased to have you aboard," "you and your branch do an excellent job," "your ability to communicate is among the best," your support of Century's objectives is, as expected, splendid."  These are hardly the comments one would direct at an employee with "inadequate work performance in major areas" and "repeated breaches" of management confidentiality.  [Doc. 16, Essig Aff.]

In contrast to the 2003 review, the 2004 review contains more criticism of Sanchez.  But even in the 2004 review, Sanchez was rated as having met "essential expectations and requirements for the position" in almost all categories, as having exceeded expectations and requirements in several categories, and both as having met expectations and as needing development to meet essential expectations in only one category.  Essig again praised Sanchez:  "Gene runs the Española facility in a very competent manner – excellent in both operations and basic work flow," Gene "continued to shine in this category" (teamwork and people skills), "Gene maintains Century's highest marks under this entire category" (same), "he does an excellent job in day-to-day operations. . . .," "when asked to move in certain areas, Gene did so with excellent results . . ., but needed a push to recognize problems and develop solutions," "Gene is flexible and adaptable...a good team player, readily

23

accepting change . . . .," Gene continued his excellent job of developing staff," "Gene does an excellent job of working with existing customers," and "Gene runs a solid branch operationally.  Both he and his entire staff are well trained, cross-trained and able to operate the entire spectrum of equipment and systems."

Even though the 2004 performance review contains some criticism, most of the criticism is couched in terms of possible improvement by Sanchez in 2005.  On the last page, Sanchez was not given the lowest possible rating: "performance seldom meets position requirements."  Instead, he was given ratings of both "performance meets all position requirements," and "performance, usually, but always, meets position requirements."  Essig then wrote a longer commentary regarding the same alleged confidentiality breaches discussed above and further stated that "action to be taken is being reviewed."  Yet, this performance review, signed by Essig on December 30, 2004, does not communicate the message that Sanchez was failing to perform and that termination was imminent, notwithstanding that Sanchez learned he was being terminated a week later.

Sanchez presented evidence that Essig planned to retire and that when he did retire, Jeff Szabat, the sole non-Hispanic Branch Manager, received Essig's position.  Essig testified that he told Szabat when he hired him that Szabat would get Essig's position if he did his job well, since Szabat had the experience.  The other four Branch Managers (including Sanchez), all of whom were Hispanic, did not apply for the position as it was not advertised.

Sanchez also supplied evidence of the bank's "fashion show" in which he felt pressured by the bank's Human Resources Director to participate and to come dressed as a "cholo" or "low-rider" because he was told Española was known for its "low-riders."  Sanchez was to dress as a "cholo" or "low-rider" for purposes of showing employees how not to dress at work, the intent apparently being

to make fun of clothing choices made by some Hispanics.   Neither this event nor Sanchez's participation in it involved Essig.   Thus, there is no evidence of a link between the "fashion show", which might be characterized, at best, as tasteless, and Essig's decision-making regarding Sanchez, which occurred almost a year later.   However, because the "cholo" fashion show made some Hispanics the object of ridicule, this might be considered evidence of the bank's practices, sentiments or beliefs regarding minorities and minority employment.   *See* Jaramillo, 427 F.3d at 1308.

In addition, Sanchez provided evidence that people at Century Bank, including Essig's assistant, believed Essig to be a "little bit racist."   Sanchez also supplied deposition testimony that Essig was not interested in a proposal by his assistant that involved the bank targeting Mexican Nationals by facilitating international fund transfers as a way of significantly increasing banking business.   Essig allegedly stated he wanted his banks to be "English-speaking banks," nor was Essig interested in Sanchez's proposal to market to smaller, predominantly Hispanic communities in Truchas or Cordova, because Essig stated he had had a bad experience with "those people."   Sanchez also provided evidence of some isolated, offensive racial epithets and racial or ethnic related comments made by Essig or other bank employees.   The comments were not related to Sanchez. Moreover, "isolated racial comments are insufficient to establish pretext unless they can somehow be tied to the employment actions disputed in the case at hand."   BCI Coca-Cola, 450 F.3d at 489 (internal citation omitted).   However, they can be considered by the factfinder in evaluating an employer's policy and practice regarding minorities.   *See* Jaramillo, 427 F.3d at 1308.

At the summary judgment stage, "all rational inferences from the evidence must be made in favor of the party opposing the summary judgment motion."   Ortiz, 254 F.3d at 896.   The Tenth Circuit has held that "evidence of the employer's general discriminatory propensities may be relevant

25

and admissible to prove discrimination." <u>Mendelsohn v. Sprint United Mgmt. Co.</u>, 466 F.3d 1223, 1226 (10th Cir. 2006), *petition for cert. filed* (Mar. 5, 2007). And, "[e]vidence of pretext may include . . . prior treatment of plaintiff." <u>Garrett v. Hewlett-Packard Co.</u>, 305 F.3d 1210, 1217 (10th Cir. 2002) (internal citation omitted). It may also include an employer's conduct *vis a vis* other minorities. *See* <u>Ortiz</u>, 254 F.3d at 896.

Century Bank argued, in part, that it "should be given a presumption that if the individual terminating the employee is the same as the person who hired him, discrimination was not the motive for the termination." [Doc. 16, p. 8.] It is unclear whether Essig, who terminated Sanchez, should also be considered the person who hired Sanchez. This is true because the bank's CEO, Chippeaux, had the final say in the hiring decision. However, it makes little difference. The "same actor inference" is an inference rather than a presumption that no discriminatory animus motivated the employer's actions. <u>Antonio</u>, 458 F.3d at 1183. The Tenth Circuit, in <u>Antonio</u>, clarified that where an employee is hired and fired by the same person "within a relatively short time span," there is a "strong inference that the employer's stated reason for acting against the employee is not pretextual." <u>Id.</u> (internal citation omitted). The Court emphasized that "the plaintiff still has the opportunity to present countervailing evidence of pretext." <u>Id.</u> (internal citation omitted).

Here, in June 2002, Essig recommended hiring Sanchez, and he terminated Sanchez in early 2005. Two and one half years might be construed as a "relatively short time span," but the cases listed by the Tenth Circuit in <u>Antonio</u> generally involved much shorter periods, i.e., eight days, three months, six months, eleven months, one year. <u>Id.</u> n. 4. Only one of the listed cases involved a four-year period between hiring and firing the employee. The Court concludes that, under these circumstances, the "same actor inference," if any, is weak.

26

**<u>Conclusion</u>**

In sum, for the reasons stated above, the Court finds that there is sufficient evidence presented to demonstrate that a genuine issue of fact remains for the jury with respect to whether Defendant's proffered reason for the adverse employment action was a pretext for unlawful discrimination.

IT IS THEREFORE ORDERED that Defendant Century Bank's Motion for Summary Judgment [Doc. 15] is DENIED.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge

27